Good morning, counsel. Good morning, Your Honors. Derek Schaffer here on behalf of Plaintiffs' Appellants. We intend to reserve five minutes for rebuttal and we'll keep track of our time. All right. Thank you, Judge Rawlinson. May it please the Court. The law under challenge, Your Honors, Proposition 211 is an unprecedented outlier that treats traditional issue advocacy as electioneering and then plows throughout entire donor chains, so as to out otherwise anonymous charitable donors. As noted by Amicus Institute for Free Speech, the law as a whole is exponentially more chilling than the sum of each overbroad part. Note first, Your Honors, how the uniquely broad definition of campaign media spending sweeps across traditional issue advocacy. Its triggers extend to expression about ballot measures, references to officeholders throughout most of the calendar, including vast chunks of legislative sessions, and ill-defined categories of partisan activity and supporting or opposing candidates subject to recall. From there, this law demands disclosure not only of direct donors, but also what it calls indirect donors. All those who gave to any organization anywhere upstream whose funds somehow found their way to what the law dubs campaign media spending. Consider, Your Honors, the church that gathers donations, more than $5,000 of which go to the NAACP or the synagogue that similarly donates to the Anti-Defamation League. If either the NAACP or ADL weighs in about a hot-button issue, an issue in Arizona like abortion, higher education, voting rights, or potentially lowering the minimum wage, which was on the ballot last election cycle, then that can trip the wires for disclosure and other burdens. At that point, all donors who gave more than $5,000 to the church or synagogue over a span of two years will be disclosed as sponsoring what Arizona calls campaign media spending. So what do you think is the main burden at issue here? Judge Sanchez, it's tough to pick them apart, but I'd say this. The fact that you have such a wide range of expression and activity that is subject to being called campaign media spending then means that every covered person has to worry about all of their donations and all of the donations upstream from that. I think the district court took a more limited interpretation of the statute, and we have a facial in as applied challenge, so we're mindful of that, but that it would be political activities related to electioneering. Why do you think it encompasses something more broadly than that? Let me take two observations about that, Judge Sanchez. First, I agree with you that the district court opined that the plain terms of the law don't mean what the plain terms of the law mean to me, at least, but there was no narrowing construction put down. So the judge did not say the law must be read the way that Judge Silver was saying it would be read under plain English. But the second point, Judge Sanchez, is this law designedly invites the most aggressive enforcement. It has a private enforcement provision. And when the private enforcer comes to court, any review of the position taken by the commission, the commission's regulations, it's de novo. It's explicitly de novo. It's de novo under Arizona law. And there's no regard for prosecutorial discretion, provided that the penalties could be at least $50,000, which is easily reached. Because there's trouble with that. Counsel, the private enforcement is not really enforcement against the organization. The enforcement is against the commission. Is that correct? In the first instance, that is technically correct, Judge Rawlinson. But as a practical matter, any entity that is the subject of the private enforcer's litigation against the commission knows that the result of that lawsuit may be that the commission needs to enforce against the ultimate target. And that means that they have to reasonably anticipate litigation, means they have to be hiring counsel, means they have to be maintaining a litigation hold, means they have to be monitoring that litigation with great fear, that the outcome of that may be an enforcement action where these provisions — But that's how it works practically. So a covered person donates a certain amount of money to trigger the law. How is that covered person supposed to figure out all the, you know, upstream donors? It could go infinitum, right, to the original source. Judge Bumate, it is infinite in its look-throughs. You're absolutely right about that. There's no precedent for that, and there's no meaningful guidance that's available. Well, don't organizations keep records? They have to keep records of their donors for tax purposes. Let me start with this, Judge Rawlinson. There is a sui generis opt-out requirement in this law, which is being trumpeted as a virtue. But that opt-out requires that any campaign media spender tell every single donor — that's the $5 donor, the $10 donor, the $100 donor — they have the ability to opt out of having their monies used for what the law calls campaign media spending. And Judge Bumate, I don't know how organizations are meant to predict what view will be taken of these very broad provisions of the law that are meant to encompass a great range of activity that may be happening outside of Arizona as well. And so to answer Your Honor's question, the records that have to be kept are records that have to be kept for five years. They are donations that are at $2,500 level, not the $5,000 level, that triggers the disclosure. And so that is a mass of records that have to be maintained solely for purposes of Proposition 211. Why would the notice have to be $5, $10 if the triggering amounts are $2,500 and $5,000? Judge Sanchez, because that's the opt-out. The opt-out provision is not subject to the same thresholds that are there elsewhere in the law, and I would point, Your Honor, to the opt-out mechanism itself. It's in 16, I believe, 972C. But it just doesn't allow for any sort of an exception to the opt-out. Now, as to whether the consequent, and in fact, the opt-out warns every donor that they may be subject to disclosure if they don't opt-out. So there's that chilling effect. There's that burden on the associational rights. But it does not specify that the trigger for the disclosure under the law would be at the $5,000 level. It just doesn't. So just to follow up, you know, the covered person is the one who's making the independent expenditure for political campaigning. Is that right? And the donor is donating to the covered person, and they have to generate the record of, this is my donation and antecedent donors to them. Is that right? That's right, Judge Sanchez. The burden falls to them, but then they're making that request of all of the upstream donors, and the law contemplates that the upstream donors will comply. By the way, Your Honor — I'm sorry. What if the upstream donors don't comply? There's no specification. What the law does say is that the donor who is reporting can reasonably rely on the information if they don't understand it to be false. Nothing specifies what they are to do if they get blanked on the information. Presumably, it could be a problem, I think it would be a problem, if they continue to accept donations from an upstream entity that refuses to make the required disclosure. So one of the problems I have is that the opt-out provision doesn't apply to indirect donors. Is that correct? That's correct, Judge Mumute. It does not. Quite anomalous. And to me, that obviously raises, you know, speech issues and association issues because that donor didn't necessarily agree with that expenditure. Is that right? That is absolutely right. And that — so my one question for you, though, is are you — do you have standing to assert that harm for that indirect donor? Well, in — first of all, we could be the indirect owner, Judge Mumute. We could be giving to an entity that then does — that then donates to what becomes campaign media spending. So we're subject to it. And in the First Amendment context, we do have — as long as we have Article III standing, which no one can question we do, we can invoke the First Amendment rights of others. And, of course, it's a facial challenge, and so this Court should be analyzing, I think, the repercussions all the way throughout donor chains, just as the Supreme Court did in Bonta. So can you — I'm sorry. Before you move on, can you explain — so square this with the No on E case, because that is also about indirect donors, and our court found that that was acceptable under Bonta. So what's the difference here? A two-judge panel did so hold, and we're not obviously challenging that holding before the panel. It was a vastly different case, Judge Sanchez. Number one, it was donations through political committees, committees that were defined as political committees and had the purposes of political committees. And even then, it was a one-step look-through, not the infinite look-through that Judge Bumate and I were discussing. In addition, Judge Sanchez, it was the — But can you follow — so what is it about the infinite look-through that makes it different than a one-step look-through? These burdens ripple far throughout Arizona — far around the country and outside of Arizona. It goes to the church. And if the church has another church that is donating to it, then it is going to be caught up in this chain of disclosures and administrative burdens. And if a charity gives to another charity and gives to another charity because they're involved in the same issues, all of those charities are going to be swept in without distinction. As long as they donated more than $2,500, right? More than $5,000, they'll be subject to disclosure. More than $2,500, yes, then the administrative burdens that come with that. But — so it's — part of it is the burdens. Part of it is the lack of tailoring. Part of it is it's antithetical to the claim purposes. Consider what Judge Bumate and I were just discussing. The indirect donor does not have the opt-out right, so they will be disclosed regardless of what the direct donor decides. The direct donor can say, I don't want to do what's being dubbed campaign media spending, but the indirect donor does not have that election. So every member of the church who gave more than $5,000, every member of the synagogue who gave more than $5,000, they're going to be disclosed as though they are supporters of campaign media spending in Arizona. They have no opt-out right. And when the public sees those disclosures, Judge Sanchez, what are they going to see? They're going to see that the electioneers in Arizona are members of a church, are members of a synagogue, are members of some charity far removed from Arizona, and the direct donors who are actually giving to the organization, they may have opted out. They may be nowhere on the list. So is the — are you essentially arguing that the further away you get from the direct donor, the government's interest in informing the public is diminished? Absolutely, Judge Bumtei. And the burdens are also exponentially compounding, because now we are radiating far outside of the penumbra of an Arizona election, and we are reaching entities that over a span of two years may have given to some entity, that may have given to some entity. So the interests are attenuated, but the burdens are extreme. Can I push back on that a little bit? I mean, the governmental interest is who — like in the Smith v. Heltzer case, who are the true donors of this campaign, you know, and to try to avoid the obfuscation of a committee with a strange-sounding name and hiding other people. Why does the government interest lessen if you have to follow the chain a few more steps along the way? To be clear, Judge Sanchez, we are not challenging a law that has some sort of an anti-circumvention aspect to it. There's an anti-circumvention aspect of this law. It's also there in Arizona law. So if you have donor chains that are giving upstream for the purpose of influencing an Arizona election that is covered by other laws, it could be covered by this law that is categorically different from what this law is trying to do. It's trying to say, irrespective of any major purpose requirement for the organization,  But the question — but I think the — but the argument that you are making with — in response to Judge Boone would say was that the interest is diminished as you go further along, and I'm — and I don't quite understand why that is. Let me be clear, Judge Sanchez. I'm not saying that if you have a chain of intentional donations that are meant to influence the Arizona election, I give to this person to give to that person to influence the election of candidate so-and-so in Arizona. I am — I can be covered under existing law because that is an effort to circumvent the restrictions on contributions and campaign spending in Arizona. And there's a federal law equivalent of that. This law is saying, I am indifferent to that as the Arizona regulator. I am saying, even if you had no contemplation that your money would wind up being used, by the way, not just for a candidate election, for a ballot measure, for a reference to a candidate who's likely an officeholder throughout most of the calendar year and an even-numbered election year, even if it's just for helping a political party, all of that is going to be covered just because that spending wound up happening in Arizona, and everyone throughout a donor chain, all the way upstream, is going to be swept into that. If you can do that, there's really no logical stopping point. So, Counsel, how do you actually do that narrowing to just the intended? Is that the ear-marking rule from the Tenth Circuit? I think ear-marking would do it, Judge Bumate. But you could also do it with the major purpose requirement that was absolutely part of Buckley and with the definition of political committees, which, again, that was there in No on E. No on E did have that sensitivity because the look-through provision operated only by looking through political committees. So, and the Court specifically noted, I believe it's at 810, 811 of the No on E opinion, specifically noted that that was important to the Court's analysis, that the person who gives to such a committee that then gives to such a committee really did have the — I'm sorry, it's 85F4, 510, 511. The Court specifically noted the person who's giving to the political committee is, by definition, giving to influence in election. That's part of how it found narrow tailoring. There's no such tailoring present in this law. But, again, it's the one bit of over-breath atop the other part of over-breath atop the other part. It's the very broad triggers that you have in the law. It's the onerous record-keeping requirement. It's the way that the opt-out requirement operates. It's the absence of any ear-marking or major purpose requirement.  A quick question before we run out of time for rebuttal. On your under-inclusive argument, you say that the unions, the fact that unions are, you know, exempt of 5 years per $50,000 per year, why is it under-inclusive? Well, I mean, I don't think it's a very controverted fact that unions have a lot to say about elections and may have a lot to say specifically about Arizona elections and have individual members who are donating an amount upward to the special. But the amount is 5,000 for both, right? Isn't that the triggering amount for both? It is. I think that it excludes the dues, Judge Bumate, if it is dues to a corporate membership or to a union. And so the fact that there's special dispensation for unions in that, I just think as a practical matter, the same reasoning that's being applied to other donor chains just are not being applied to unions in the same way. And that, I think, is fair. Thank you, counsel. Thank you, Your Honors. May it please the Court, I'm David Kolker, representing Voters' Right to Know, and along with Eric Frazier, we'll be arguing on behalf of the defendants and intervenors. Prop 211's plainly legitimate sweep closes the loophole that has arisen with the explosive growth of dark money campaign spending. While the law's requirement to disclose the original sources may be somewhat new, the constitutional issues at stake are not. The disclosure of campaign donors has been required and upheld for more than 50 years, and in many ways, this law is actually more narrowly tailored than other laws. Going back to the McConnell decision from the Supreme Court, we have been aware of the fact, and the Court has recognized, that some sophisticated spenders will use, quote, dubious and misleading names by setting up a front group to make campaign expenditures, hiding the real source of the money. One example from the Supreme Court decision was Citizens for Better Medicare, which was actually a group funded by the pharmaceutical industry. Prop 211 prevents this kind of abuse. In Citizens United... But it's pretty broadly doing that, because it's making everyone disclose, add infinitum to the original source. Why couldn't it just have a more narrowly tailored earmarking mandate or major purpose test to get to the same result? The problem, Your Honor, with earmarking is that it's so incredibly easy to evade. The Supreme Court, especially in the McConnell decision, has recognized over the years that laws are passed and people evade them. And earmarking in the Colorado Republican... How is that in the record? Is that in the record somewhere, that earmarking is easy to evade? Yes. We have a quote from the second Colorado Republican decision where the Court says that's sort of the most clumsy, easy way to evade. It just doesn't do very much. And when people can give a million dollars to an organization and say, you know, I'd really hope that we get good pro-market people or good pro-Medicare people elected and not specify who it should go to or which candidates it would support. But people have these wink and nod understandings, and the money gets passed on. And the real source is the million dollars. And you can do that very easily without earmarking. The problem is that it's just, you know, the sweep of this law is so broad, it's not targeted just towards that. It's targeted towards, you know, an example of the, you know, the Catholic nun donating to the firearms person who then donates to a pro-choice group. Like, it's used to add the person in two. Well, my opponent oversimplified how this works. Okay. Okay? The last donor to the spender is the one who gets to choose whose money it's passing on. So if you're sitting on $100,000 and you're only going to pass on $10,000, you get to pass on. So if a church is going to pass on donations from the people who gave it, it gets to decide whose money is being passed on. So this law does not exist in a vacuum. People talk to each other upstream and downstream. And somebody... How is the church supposed to know if the donor to the church got that money from another donor? Well, if that church... So the last donor is responsible for telling the spender of the original sources. That's how the statute is. Wait. Sorry. Say that again? It's the direct donor to the spender who has to reveal to the spender what the original source is of the money that the donor is giving. Right. How is the... How are you supposed to figure out the original source? Well, the law sort of divides up the burdens. The last donor has to figure that out. And if it can't, then it can't pass on that money without opting out. That's all that it is. So that this law... So the church would have to find out who the donor got the money from. Well, if the donor to the church is just an individual, then it's their personal monies, and that's the end of the traceback. But does the church have to ask that person, is this your money, or did you get this from someone else? The law doesn't specify how the donor... It's free to the donor to decide how to figure that out. The other thing to remember is if you're sitting on $100,000, but you only got $1,000 from each person to give you that $100,000, then you don't have to reveal anybody's name because it's below the thresholds. So if you're, you know, I think the examples are very unrealistic. You can see these burdens are pretty high, right, on the donors there. Well, look, the donor has an option. The way this law enhances donors' freedom and First Amendment rights is they get to choose how they associate with the spender. If they want to support, if I want to support the Sierra Club or the NRA, and I want to give them a million dollars, but I, you know, I want to support their gun program. But you agree that the op-ed doesn't apply to the original source, correct, if it's an indirect original source? Correct. So then how is that person's rights protected? Because this law doesn't exist in a vacuum. Non-profit, for example, 501c organizations make grants all the time. But when they make grants, none of that money can be used for electoral politics. They simply restrict the donation. So it's just the good nature of the organizations that allow, that protects donors' rights, essentially? No, it's that, it's that people who are concerned about showing, people giving away large amounts of money, but concerned about showing up in a disclosure report or having their money used for electioneering in Arizona will... Just take the example of the nun who donates to the, you know, the firearm group and then donates to the pro-choice organization. How is the nun's right protected if she doesn't want to be associated with pro-choice activism? Well, when she gives, I'm forgetting who she gives to. When she gives away her money... To the firearms group. Okay. When she gives away her money, she can say, don't pass it on to somebody who doesn't support some of that. Okay. And then if the firearms group doesn't honor that... Well, but that's not the law's fault. That's a failure of communication between the nun and the group. I mean, this law... But it's also a violation of her First Amendment rights, right? Then she's involuntarily being associated with pro-choice activism. Counsel, is that a violation of our First Amendment rights? No, I don't believe it is. Really? The law assumes, our nation assumes that people understand what the law is. Now, Congress, for example, often has six-month waiting periods before a law goes into effect because people need to learn the new tax code or whatever. So we just can't assume that they'll remain ignorant and not protect themselves. When people give away money, they're making a choice. And if they don't trust the person they're giving it to, they can put a restriction on it. This law tries not to micromanage the relationship up and down the chain of donations. It gives people choices about how they associate. So you don't see a... Do you agree with opposing counsel's distinctions about No on E? Or do you think it's more supportive of your position than... I think No on E is a... The law at issue there is constitutional. I think this law is easier to defend because I think No on E did not have an opt-out provision. This does. So this narrowly tailors the law and gives donors much more choice in how they associate. The other thing about No on E is that, although this may sound counterintuitive, this law obviously requires more information to be reported because it goes back to the original source. But we believe that makes it... That's the problem. Is there a huge distinction with No on E where No on E just goes back one level, I believe. Yes, but that makes... But this could go infinitum, right, to the original source. That is correct. But that makes this law more narrowly tailored, Your Honor, because what one of the dissents in the en banc opinion pointed out, that No on E, the law there, could be viewed as underinclusive because, again, the lessons of campaign finance, which the Supreme Court has routinely recognized, people will go three steps back to avoid the San Francisco law. This law is more narrowly tailored at getting at the original source, the information people really want to have. What I... Would you agree, though, that the further you go back, the government's interest in, you know, in knowing who's been informing, who's been spending money on political activity is diminished because, you know, the example of the non, you know, to the firearm, to the pro-choice group, I mean, what's the interest of the... What's the public's interest in knowing that a non donated to a firearm group that then donated to a pro-choice group? Your Honor, the important thing is to go to the original source.  This law... But why, in that example, like, why is that important? Well, it's easy to make an example where money gets passed on and the original source seems to have a distant relationship. Correct. Okay? But there's also no harm in that. Well, the important... She's being harmed because the non is being harmed because she's being associated with the pro-choice group. Well, again, she has free will. She can decide how she gives away her money. The important thing is that the disclosure of original sources can simply be easily evaded by going one step further back. No, I agree that's a concern. Okay. Your Honor... But you would also have to agree that the interest can also be diminished, you know, the further you get away from the actual spending. The Supreme Court has ruled in the Washington State Grange case that they have, that they rejected a paternalistic argument, right? These strings of donations, if they occur, will be in the reports. We trust the people to look at that information. Just because a non is listed doesn't mean that she'll be badly associated with somebody. People will look at the disclosure records, see how many steps back it's gone, see how deluded it is. For example, Your Honor, let's say somebody gives away a million dollars and that ends up being 80 percent of the money that the spender has, even though it was passed on five times. Well, that's critical information because they're really the bank roller. In another case, it may be that there are 20 people who each gave $50,000 and the spender ended up with a million dollars. Well, we have faith in people to look at the record and say, well, you know what? They gave $50,000. They were a bunch of steps back. Maybe they're really not, you know, in sync with everything the spender does. We trust the people to look at the information, understand what the law requires, and draw appropriate conclusions. I take it your argument then is, under a common sense way of thinking about it, if an original source donor gives a million dollars and somehow that person ends up in the top three of an ad, it's unlikely that their money would have just gone in ways that were completely unintended to what they were thinking. That is what experience has told us, Your Honor. And I was going to ask you if Noah, Noah on E says that the modest burden on the First Amendment right does not outweigh the government's interest in providing voters with information. That is absolutely correct. So we're looking at the weighing of those two perspectively. And what I wanted to emphasize, Your Honor, is the Citizens United decision. That when that decision opened up the door to corporate spending, it relied on the fact that an integral part of its reasoning was that though there would be more campaign money coming in from corporations, the people would know that there would be effective disclosure in the court's words. Well, that has not happened. And part of the reason it hasn't happened is that Citizens United also opened the door to using corporate front groups and intermediaries. So we now have the specter of limited liability corporations and nonprofit corporations, which previously couldn't make campaign expenditures, used in a series of chains to evade the law. And it is contrary to Citizens United to say that the government is powerless to step in to bring the kind of effective disclosure that the Court assumed. The Court basically said to us, don't worry. There will be a lot of corporate spending, but democracy will survive because we'll know where the money is coming from. Counsel, do you agree that people have the right to use speech and associate anonymously? In certain aspects, yes, but not in the campaign finance area. Oh, really? So just categorically in the political sphere, that people do not have the right to don't? It depends where in the campaign finance area. Historically, from going back to the founding, our political actors always used synonyms and things of that nature to hide their true identity. Well, starting in Buckley 50 years ago, the Court made it clear that anonymous donations are not part of our jurisprudence. So we're not allowed to take the interest in anonymous political activity to balance that against any of the other interests that we've recognized in informing the public about who's involved in political activism? Well, the Court has told us that disclosure is the least restrictive way to curb election ignorance and to curb corruption. So in this area, the Court has said that the government interests are so strong and so much less intrusive than contribution limits or spending limits that we will tolerate that modest burden because it's the best way to have an informed democracy and it's the best way to shine light on these money transactions so that we can hold our officeholders accountable once they're in office. Counsel, you've exceeded your time. Could you wrap up, please? Yes. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, my name is Eric Frazier. I represent the Arizona Citizens' Clean Elections Commission. I'll jump right to this concept of donor ignorance because AFP's whole argument relies on a level of donor ignorance that is unalleged, unargued, and implausible. Because this is a facial challenge, this is not a case about a nun who gave $5,000. This is a group that wants to block this law for everyone and everything, which means that they have a high burden of showing that the super-ignorant donors who don't know where their money is going and don't know how to control how their money is used are a substantial number of the law's applications. But that is unargued and unalleged. AFP says that donors don't know where their money is going and that they may end up disclosed in connection with ads or causes that they don't know about and don't necessarily agree with. That's this concept of the nun that we're talking about. There are three fundamental problems with that argument. So do you concede, then, the nun who donates to the gun control groups and then donates to a pro-choice group, that her First Amendment rights are being violated by being associated with the pro-choice movement? I don't, Your Honor, because there is no forced association. The law merely provides factual information about funding flows that have, in fact, occurred, and those funding flows occurred voluntarily. Reasonable voters understand the differences between funding an organization and endorsing every message the organization speaks with. That's what no one e-held. Well, doesn't that count against you, though? That's the whole point of this law is that the implication that if you donate to this That's not the implication, Your Honor. The core principle behind this law is that voters want to know where the money is coming from. In some cases, that may be How is that helpful if, you know, everyone understands it? It doesn't Because in some cases, that may be very, very informative. And for some donors, it may be less informative. But that's why this can't survive a facial challenge where they would have to demonstrate that those less informative cases are a substantial number of applications. And this court rejected that exact argument, Your Honor, in no one e, where it said that the Constitution does not require the law to ensure that every donor agrees with every aspect of the message. That was the rejection of the same associational argument that's being made here. Would you agree the further you go down the, you know, the donation chain, though, the more likely is that the donor doesn't agree with the overall the political activity? I don't agree with that, particularly on a facial challenge. Because there are plenty of situations where someone is giving away millions of dollars through, you know, 10, 15 intermediaries, however many it takes to try to hide, and that is very informative. That is what the voters want to know about. And why couldn't earmarking or the, you know, major purpose test find that? For the exact same reason that Mr. Kolker explained, that those things are trivially easy to avoid. They're not constitutionally required. No case is held that they're constitutionally required. How are they easy to avoid? Why are they easy to avoid? Because, again, you can donate a million dollars and, you know, because of your past relationships, everyone knows where you expect that money to go. But I think the key thing here is that no court has ever held that earmarking is constitutionally required.  And so, again, you can make that you can make some of the same arguments with the existing disclosure laws that only go, I'm sorry, only go to the donor that actually spent the money. Because someone might support a candidate for his position on taxes, but not his position on immigration. If that person donates money to the candidate, it can be spent on an ad on immigration that the donor doesn't agree with. It's going to get disclosed under existing law, and you have the exact same argument. But nevertheless, the same. But I guess the difference, as Nguyen E. pointed out, is that they're donating to something that is going to use it for political campaigning, as opposed to something further back. Sure. But here, I mean, again, this law only applies to major donors and major spenders. And so the high dollar thresholds, I think, provide a substantial level of protection to donors. This is not about somebody who gives $200 to a church. These are people who are giving $5,000. The spenders are spending $50,000. These are really high thresholds. These people are major donors. They're sophisticated players. They know how this works. They often know where their money is going. And more importantly, they know how to control where their money is going. People who give major gifts of that size know exactly how to control how their money is spent. Can I ask you about the as-applied claim and whether plaintiffs made sufficient allegations on an as-applied basis for potential retribution if their identities were discovered, even if they didn't want to have that happen? They did not make sufficient allegations. They had an opportunity to amend, as you know. But these are just general allegations about boycotts, character attacks, personal threats to their supporters. But there are no allegations that those things occurred because of any donations with the organization or even because of the affiliation with the organization. The word supporters, it could mean a political officeholder who has already been elected, supports AFP's ideas, and is being attacked because of things he's done as an elected official. There's nothing in the complaint that suggests that those things occurred because of disclosure or even because of donations to AFP. So those are not the – those do not reach the level that you would need for an as-applied challenge, which requires a reasonable probability that the group's identities were disclosed, rather than because of other activities that they are doing in the real world. Counsel, can I ask, so the Arizona Supreme Court has accepted discussion review of this law. Is there any reason why we should not hold this case in abeyance and wait for the Arizona Supreme Court to rule on it first? You should not hold the case in abeyance. No one has asked you to do that. And the grant of review in the Arizona case is based solely on the Arizona Constitution. Sure. But, you know, for reason – prudential reasons, constitutional avoidance reasons, why wouldn't we want to wait for them to rule? It's a State law. It's the Supreme Court of the State. Why not defer to them? Well, again, because the issues that they'll be resolving arise under the State Constitution. The issues in this case are ripe. And it wouldn't affect our ruling – I'm sorry. I'm sorry. It wouldn't affect our ruling on the Federal Constitution, which is First Amendment.  That's correct. The issues in this case are ripe, and we think the Court should resolve the issues. Although if they were to strike it down under the State Constitution, there would be nothing for us to rule on, correct? So there are different dispositions that could affect whether there is a live case, but there are other dispositions where this Court still would have to resolve the case. So why not hold it in abeyance and wait for that to figure that out? That's, of course, up to your discretion, but I think the better course here is to resolve the case now. I don't think either side has asked you to hold the case in abeyance. This is a facial challenge, and so I think the key message here is that AFP cannot block the law by showing that there could be odd maximalist interpretations of the statute that might lead to odd results. It has to show that a substantial number of those applications would be unconstitutional. Thank you, counsel. Any questions? Thank you. Gabbardo. Thank you, Your Honors. Let me start with the legal framework, if I may. There's no question as to what the prevailing rule is from the U.S. Supreme Court in the Bonta case, that you do have donor anonymity, just as you asked, Judge Breyer, in the political context, too. Traditional issue advocacy, the Court has made clear time and time again, is not subject to campaign finance regulation, and you also have McIntyre that stands for the proposition that, just as Your Honor said, from the founding era on forward, we have a tradition of anonymity in the political space. Now, we are not challenging the premise that when we're talking about traditional regulation of traditional electioneering, there are special interests in that narrowly defined context that can win the day under exacting scrutiny. But it is not, with all due respect, Judge Rawlinson, an abstract informational interest. The government could not say we want medical records, we want tax information. But that's not what this law does. Well, but I think, Judge Rawlinson, it gets perilously close to that. And with all due respect for my friends for the other side, they have no principled outer limit. They say they want to know the source of the original monies. That could be the bank account. That could be the counterparty. That could be the employer. That could be the parent who passed away. Those are original monies. Unfeasible. You know, the Court tells us repeatedly that we shouldn't engage in hypotheticals that are not tethered to the plain language of the statute. Isn't that what you're conjuring up a little bit right now? Judge Sanchez, I don't think so. My arguments are from the plain text of the statute. And I think it speaks volumes to Your Honors that regulations have been passed that change the plain terms of the statute, not in any binding way, not in any way that would receive deference from Arizona courts, but just for the sake of doing the tailoring that is not there on the face of the statute. Those are smoking-gun evidence that the regulators had to change the law in order to dress it up for judicial review. That's not the proper facial review, and that's not the design of the law, which says the private enforcer can come into court without regard for those regulations and say that the commission has not been faithful to what the plain terms say. All of my arguments are from the plain terms, Your Honors. And my friend from the other side said that this is closing the loophole and that, you know, existing law is incredibly easy to evade. Let me please take the example that they have in the voter right to know brief, where there was Arizona Public Service that, as they describe it, gave some inordinate amount of money, $20 million or something like that, or $13 million to influence the 2014 election, and it came to light years later. They evidently did that through a shell company that then gave to the campaign media spenders, the ones who actually spent to influence elections to the commission. Well, as I understand their description of the law and how the opt-out works, and they went through this very clearly, if you are that direct donor to the campaign media spender, that would be the shell company, you can opt out and say, we are not going to have certain monies upstream used for this purpose. So if the intermediaries had had, say, $20 million in their coffers, they could have said, we're opting out of reporting $10 million in donations that came from public Arizona Public Service. Arizona Public Service would not wind up disclosed, because it would have opted out. They would take their monies out of the chain, they would not be reported at all, and it's the upstream donors upstream of them who get reported. They have no opt-out, Judge Bumate. They have no ability to take themselves out of that chain. They don't have the same sophistication. They're not thinking in terms of campaign media spending and the idiosyncratic, at best, way that Arizona has defined campaign media spending that goes far beyond traditional electioneering. And so this idea that every donor nationwide, all of whom could be caught up in this infinite look-through chain, that they're all going to be thinking about Arizona's definition of campaign media spending, and they're going to be able to anticipate what Sheriff Joe may be doing or what issues may be coming up with immigration or voter integrity or, you know, the minimum wage in Arizona, they're not going to know that. They're just going to have given money that was then given, and someone's going to care about these issues and speak to these issues, and then the proponents of this law will say, they're all subject to the same disclosure that would be associated with donors to a political committee. Robertson, can I ask, do you have a position on whether or not we should hold this case in abeyance pending the Supreme Court, Arizona Supreme Court's review of this case? We don't, Judge Bumate. We think you can speak just as well to the constitutional issues. I also think for the sake of judicial efficiency, you may wait. I think it's a totally fair question for the Court. We just don't have a position on it. And I think the notion that I want to speak to, that the public will know from these disclosures the difference between the none and the traditional donor, no, they won't. If you read the provisions, they do not distinguish at all in the reporting for the direct versus indirect donors. The whole design of the law is all you care about is original monies. And the reporting is of every intermediary and every transfer without distinction. There is nothing in the law that says the voter is going to know this is the none versus this is the multimillion-dollar donor who gave to influence an election. All right. Thank you, counsel. Thank you to all counsel for your helpful arguments. The case just argued is submitted for decision by the Court. That completes our calendar for the day and for the week. We are adjourned. All rise. This court for this session stands adjourned.
judges: RAWLINSON, BUMATAY, SANCHEZ